[Civ. No. 13182. Second Dist., Div. Two. Apr. 10, 1942.]

WILLIAM SISTROM, Appellant, v. L. V. ANDERSON et al., Respondents.

A. Ronald Button for Appellant.

Joseph A. Ball and Frank C. Charvat for Respondents.

HANSON, J. pro tem.—This is an action for damages for breach of contract, in which the question for decision is whether a written cancellation of the contract sued upon is binding upon the parties to it.

Appellant, who was plaintiff below, for some ten years, has operated a ranch in Arizona where he raises a considerable number of turkeys. During this same period the defendants, as partners, have been engaged in the retail and wholesale meat business at Long Beach. It was the custom of the defendants to purchase in other states, among them Arizona, their annual holiday supply of turkeys. In these transactions the defendants were represented by defendant Anderson, who not only had visited plaintiff's ranch in Arizona and knew plaintiff was an extensive producer of turkeys, but he knew the buildings and facilities which plaintiff had at his ranch for killing and dressing turkeys. Moreover, he was familiar with the temperature conditions which prevailed annually in Arizona during November and December.

By the terms of the contract, which respondents contend was effectually cancelled, plaintiff undertook to sell and deliver to defendants between November 15, 1936, and Janu-

ary 15, 1937, so much of his entire flock of turkeys, stated to number 3350, then on his Arizona ranch, as might be ready for market in the period mentioned. On their part the defendants, as buyers, agreed to accept deliveries at the ranch on such dates in the period as the seller should designate by notice to them. There was a proviso that the notice should state the approximate number of turkeys which would be delivered. Moreover, the buyers undertook on the dates designated to grade, pack and pay for the turkeys tendered at certain designated prices per pound, dressed weight, dependent upon their grade in accordance with a standard set forth in the contract. Except for the fact that the contract required payment on a basis of "dressed weight," there was nothing to indicate which party should kill and dress the turkeys and there was no testimony on the point. Moreover, the contract says nothing about the seller's being required to provide any facilities, such as cooling rooms or ice, nor any restrictions on delivery because of any high temperature conditions which might prevail.

It is undisputed that the seller gave timely and proper notice to the buyers that he would be ready to deliver a certain number of turkeys on November 13 and a further number on the next day. While these dates anticipated the first delivery date as set forth in the contract, no objection was made thereto. Moreover, the evidence discloses that one of the defendants—Anderson—was on hand on November 13 and not only accepted delivery on that date of the first lot of turkeys which plaintiff killed and dressed, but graded and packed them at plaintiff's ranch and gave his check to plaintiff for them. It appears, however, that he did not stay on the ranch the next day to accept, grade and pay for the lot of turkeys which were killed and dressed on that day. Instead he returned to the ranch on the following morning, when he observed that the turkeys killed and dressed on the preceding day had deteriorated over night due to a lack of cooling facilities. While the seller, owing to a heat of 84 degrees outside on the previous day, had brought ice into the room where he placed the dressed turkeys so as to reduce the temperature therein to 70 degrees, he did not maintain the temperature at that point or lower after he had dressed the turkeys. As a consequence the dressed turkeys on the morning of the 15th appeared "green," in the language of the trade, and were no longer in prime condition. Before Anderson observed the condition of this second lot he had

information from his partner at Long Beach that the first shipment had arrived in a "green" condition. On the morning in question not only did a dispute arise between plaintiff and Anderson as to the various grades Anderson was *then* assigning to the lot, but Anderson informed the seller that an agent of the government of the United States would not issue a certificate for the lot. The record does not disclose the meaning or import of such a certificate. In the absence of such proof we assume that such a certificate was necessary in order that the dressed turkeys might be shipped in interstate commerce. At all events, it is undisputed that Anderson advised plaintiff that the first lot of turkeys had arrived in Long Beach "green," and that unless plaintiff would accept his check for the second lot on the basis of his grading, and cancel the executory obligations under the contract, he would refuse to accept delivery of the lot and would not pay for them. In addition he threatened to stop payment of the check which had been given for the first lot, which had, as yet, not been collected. While the plaintiff strenuously objected to this proposal, he was faced with the alternative of yielding to it if he wished to have the outstanding check paid and the second lot of turkeys taken off his hands in accordance with the value predicated on the grading made by Anderson. Accordingly, he was induced to cancel, in writing, the executory provisions of the contract in return for having the outstanding check paid, along with the issuance of a check for the second lot.

In view of these facts appellant contends that the contract of rescission was without consideration, in that what respondents agreed to do they were obligated under the contract to do, and, secondly, that appellant's signature was procured through duress of goods and business compulsion. In answer to these contentions respondents, while agreeing that a consideration was essential, argue in effect that there was a consideration, in that (1) they were not obliged to pay the full contract price for the first shipment, as on its arrival at Long Beach it had deteriorated due to the inadequate and improper packing facilities on plaintiff's ranch in hot weather; (2) they were not required to accept delivery of the second lot because of such deterioration and for the further reason that Anderson could not get a government certificate on the morning of November 15th because of the existing condition of the birds; and (3) the market price for turkeys was uncertain and that this uncertainty supplied

a consideration. In response to the contention urged by appellant that there was duress of goods and business compulsion, respondents argue that this doctrine, on these facts, is inapplicable. We think it is obvious from the statement of the contentions of the parties that neither appellant nor respondents come to grips on the precise rule of consideration which is here applicable. ■ However, before proceeding to a discussion of this and other points it is important to note that as the original contract was to be performed in Arizona and the written agreement of cancellation was executed by both parties in that state, its law is determinative of the controversy before this court. (Restatement, Conflict of Laws, secs. 358 and 347.) On the initial question, whether there was a consideration for the release of the contract sued upon, Arizona follows the rules laid down by the common law. (*Pleasant* v. *Arizona etc. Co.*, 34 Ariz. 68 [267 Pac. 794]; *Miller Cattle Co.* v. *Mattice*, 38 Ariz. 180 [298 Pac. 640]; *J. D. Halstead Lumber Co.* v. *Hartford etc. Co.*, 38 Ariz. 228 [298 Pac. 925].) Under those rules there must be a consideration to extinguish the obligations created by a written contract. (6 Williston on Contracts, rev. ed., sec. 1826, note 2.)

■ The difficulty with respondents' first argument is twofold. First, the contract did not impose upon the seller the obligation to provide cooling facilities, but instead by implication placed the duty on the buyers. Second, defendant Anderson was conversant with the conditions under which the first lot of turkeys had been killed and dressed, and so when he issued his check therefor that transaction was closed so far as making a claim that subsequent deterioration came about through plaintiff's inadequate facilities. (*Miller Cattle Co.* v. *Mattice*, 38 Ariz. 180 [298 Pac. 640].) ■ Even in a case where there is a right of inspection, a buyer waives an implied warranty of fitness by accepting the goods. ■ In the instant case the only implied warranty, if there was one, was that the turkeys were of merchantable quality when dressed, not that they would be of such quality thereafter. There is no suggestion in this record that the turkeys were diseased. Therefore there is no basis upon which respondents could have defended against a suit for the amount of the check, had they stopped payment of it. The second argument is not bettered by the additional argument therein based upon the fact that Anderson could not obtain a government certificate for the second lot. The answer to that argument is that plain-

tiff did not engage to supply such a certificate nor did he agree to keep the turkeys after they were dressed in such condition as would require or warrant the issuance of such a certificate. The third argument obviously is no argument at all.

It follows that the buyers were obligated to take delivery of the second lot of turkeys as they had taken delivery of the first lot, and pay for them on the basis of their grade. That being true, the threat that they would stop payment on the first check and would not pay for the second lot was idle and had no legal basis. They were obligated to pay, and so would have suffered no detriment by making the payment which the law required. However, as the contract of cancellation was bilateral and released each of the parties with respect to all the executory obligations of the original contract, these mutual promises supplied the necessary consideration. Here the seller was relieved from delivering any more turkeys and the buyer was correspondingly relieved from accepting and paying for them. (6 Williston on Contracts, rev. ed., sec. 1826, citing the cases.) The fact that the seller did not in reality wish to be relieved does not alter the fact that there was a consideration. This is not a case where a separate and independent consideration is required, such as where one of the contracting parties is relieved from an executory obligation with no corresponding relief or gain to the other party, and for that reason appellant's authorities are not in point.

We come, then, to the question whether on the facts the doctrines of duress of goods or business compulsion are applicable. As the respondents had set up the agreement of cancellation and appellant was contending that it was invalid as a defense, the parties entered into a written stipulation to submit the case to the trial court to determine whether the cancellation was legally effective or whether it had been induced by fraud or duress on the part of the respondents. The court made no finding on the issue thus directly submitted to it. This we think is accounted for by the fact that the court thought such a finding was unnecessary in view of its finding that the plaintiff had not performed his obligations under the written contract and that the defendants had fulfilled all their obligations thereunder, even to the extent of accepting deliveries ''of those [turkeys] available for marketing,'' and had not neglected to pay for them and had

not on their part breached performance of the original written contract. This finding is based on the theory that it was the duty of plaintiff to keep the turkeys in marketable condition after they were dressed. But this, as has been pointed out, is not a correct construction of the contract. Hence the finding is not sustained by the evidence, and, moreover, we are without a finding on the vital issue whether the release was or was not induced by duress of goods or business compulsion. ■ Where, as here, the entire case must turn on a single issue of fact, i. e., whether or not there was ''business compulsion,'' we would ordinarily resubmit that question to the trial court. But where, as here, the case was submitted below on a written record, we think we may well decide that fact issue. We turn first to a discussion of the principles of law which govern.

■ Duress of goods, moral duress and business compulsion, so called, all stem from and are but an expansion by courts of equity of the old common-law doctrine of duress. The modern nomenclature is simply an attempt to differentiate between the various recognized modern types of duress with its earlier common-law definition. In its new habiliments the doctrine is generally recognized, but the tests for its application vary. Duress, in the early common law, embraced within its scope only such acts or threats as resulted from fear of life, the loss of a member, mayhem and imprisonment. As the scope of the doctrine was enlarged by the equity courts they soon began to differentiate in the cases between duress of the person and duress of the goods or property of a party. ■ Where an act was accomplished by imprisonment, by threats or by an exhibition of force which apparently could not be restricted, the act was classed as duress of the person. But where the act consisted of a tortious seizure or detention of property from the party entitled to it, and requiring some act as a condition for its surrender, the act was classed as duress of goods or property. (Cooley on Torts, 4th ed., sec. 367.) Where the act of compulsion is not strictly one which may be defined as either duress of the person or of goods or property, but is more nearly analogous to duress of person, the courts often speak of it as involving ''moral duress'' or ''business compulsion.'' But regardless of these labels, ''the modern tendency of courts of law is to regard any transaction as voidable which the party seeking to avoid was not bound to enter into and which was coerced by fear

of a wrongful act by the other party to the transaction. The earlier requirements of common-law duress may be regarded as merged in this broader definition.'' (5 Williston on Contracts, rev. ed., sec. 1603.) This represents the rule in Arizona. (*Lundvall* v. *Hughes et al.*, 49 Ariz. 264 [65 P. (2d) 1377]; *Potter* v. *Home Owners' Loan Corporation*, 50 Ariz. 285 [72 P. (2d) 429, 432.] See also Rest. Contracts, sec. 492.)

The test in any case is whether the complaining party was or was not in a position to exercise his own will. If the unlawful threats overcome the will of the person threatened, and ''induce him to do an act which he would not otherwise have done and which he was not bound to do,'' duress, as it is viewed today, is effectuated. (5 Williston on Contracts, sec. 1605.) It is not, however, unlawful to threaten to refuse to proceed under a contract or to pay what is due under it or what is otherwise due. Hence a threat to stand suit is not in the category of unlawful threats.

In the instant case the most that can be said for the evidence of the plaintiff is that he acceded to the cancellation of the contract in order to get the money that was due him on the first as well as his second delivery of turkeys, instead of being required to sue for it. Accordingly, while defendants took an advantage of the plaintiff, it was not an advantage which would constitute duress under any of the modern doctrines. For that reason the judgment must be affirmed.

Judgment affirmed.

Moore, P. J., and Wood (W. J.), J., concurred.