## PLOTNICK v. PENNSYLVANIA SMELTING & REFINING CO.

No. 10533.

United States Court of Appeals
Third Circuit.

Argued Jan. 10, 1952.

Decided Feb. 21, 1952.

860

Sylvan C. Balder, Philadelphia, Pa.. (Blanc, Steinberg & Balder, Philadelphia, Pa., on the brief), for appellant.

Nochem S. Winnet, Philadelphia, Pa. (Charles M. Solomon and Fox, Rothschild, O'Brien & Frankel, all of Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH and HASTIE, Circuit Judges, and BURNS, District Judge.

HASTIE, Circuit Judge.

This litigation arises out of an installment contract for the sale of quantities of battery lead by a Canadian seller to a Pennsylvania buyer. The seller sued for the price of a carload of lead delivered but not paid for. The buyer counterclaimed for damages caused by the seller's failure to deliver the remaining installments covered by the contract. The district court sitting without a jury allowed recovery on both claim and counterclaim. This is an appeal by the seller from the judgment against him on the counterclaim. The ultimate question is whether the buyer had committed such a breach of contract as constituted a repudiation justifying recission by the seller.

Suit was brought in the District Court for the Eastern District of Pennsylvania. Federal jurisdiction is based on diversity of citizenship. Consequently, the conflict of laws rules of the forum, Pennsylvania, are invoked to solve the choice of law problem. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. This involves no difficulty since familiar conflict of laws doctrine accepted generally and in Pennsylvania tells us that legal excuse for the non-performance or avoidance of a contract is to be determined in accordance with the law of the place of performance. Restatement, Conflict of Laws, Pa. Annot. § 358 (1936). Beyond this, the parties agree, and correctly so, that Pennsylvania is the place of performance in this case. Therefore, we apply the substantive law of Pennsylvania, particularly the Uniform Sales Act, to determine the legal consequences of the operative facts.

Uncontested findings of fact show that the contract in question was the last of a series of agreements, several of them installment contracts, entered into by the parties between June and October, 1947. Under these contracts, numerous shipments of lead were made by the seller in Canada to the buyer in Philadelphia. The seller frequently complained, and with justification, that payments were too long delayed. On the other hand, several shipments were not made at the times required by the contracts. However, by the end of March 1948, all contracts other than the one in suit had been fully performed by both parties. In this connection, it was the unchallenged finding of the district court that both parties waived the delays which preceded the buyer's breach involved in this suit. The earlier delays are relevant only insofar as they may reasonably have influenced either party in its interpretation of subsequent conduct of the other party.

The contract in suit was executed October 23, 1947 and called for deliveries aggregating 200 tons of battery lead to be completed not later than December 25, 1947. The agreed price was 8.1 cents per pound, or better if quality warranted. The court found that it was the understanding of the parties that at least 63 percent of the price should be paid shortly after each shipment was delivered and the balance within four weeks after that delivery. This finding is not contested.

Under this contract a first carload was delivered November 7, 1947. About 75 percent of the price was paid six days later. A second carload was received January 8, and about 75 percent of the price was paid 10 days later. Final adjustments and payments of small balances due on these two carloads were completed March 30, and these shipments are not now in dispute. The earliest shipment immediately involved in this litigation, the third under the contract, was a carload of lead received by the buyer on March 23, 1948. This delivery followed a March 12 conference of the parties. They disagree on what transpired at that conference. However, about 290,000 pounds of lead were then still to be delivered under the contract which stated December 25, 1947 as the agreed time for the completion of performance. And shortly after the conference, one carload of 43,000 pounds was delivered. No part of the

price of this third carload has been paid. It is not disputed that plaintiff is entitled to the price of this shipment and his recovery on his claim in this suit vindicates that right.

On April 7, the buyer, who had been prodding the seller for more lead for some time, notified the seller that unless the balance of the lead should be delivered within thirty days he would buy in the open market and charge the seller any cost in excess of 8.1 cents per pound. On April 10, the seller replied refusing to ship unless the recently delivered third carload should be paid for. On May 12, buyer's attorney threatened suit unless the undelivered lead should be shipped promptly and at the same time promised to pay on delivery 75 percent of the price of this prospective shipment together with the full price of the third installment already received. Seller's solicitor replied on May 22 that seller regarded the contract as "cancelled" as a result of buyer's failure to pay for lead already delivered. At the same time the letter stated the seller's willingness to deliver at the originally agreed price if the overdue payment should be made by return mail and a letter of credit established to cover the price of the lead not yet shipped. Buyer's attorney replied on May 25 that buyer had withheld the price of the third carload "only as a set-off by reason of the failure of your client to deliver" and that buyer would place the overdue payment in escrow and would accept the remaining lead if shipped to Philadelphia "sight draft attached for the full invoice price of each car". On May 27, seller's solicitors reiterated the position stated in their March 22 letter and on June 2 seller notified buyer that the Canadian government had imposed export control on lead. The district court found, and it is here admitted, that between October 1947 and May 1948 the market price of battery lead increased from 8.1 cents to 11½ cents per pound.

The court concluded that the failure of defendant to make a down payment of at least 63 percent of the price of the third carload constituted a breach of contract but "not such a material breach of the contract as to justify plaintiff in refusing to ship the balance due under the contract within the meaning of section 45 of The Sales Act". This was the decisive conclusion of law which the seller has challenged.

■ Section 45 of the Sales Act as in force in Pennsylvania provides in relevant part as follows: "Where there is a contract to sell goods to be delivered by stated instalments, which are to be separately paid for, and * * * the buyer neglects or refuses to * * * pay for one or more instalments, it depends in each case on the terms of the contract, and the circumstances of the case, whether the breach of contract is so material as to justify the injured party in refusing to proceed further * * * or whether the breach is severable, giving rise to a claim for compensation, but not to a right to treat the whole contract as broken." Pa.Stat.Ann.Tit. 69, § 255 (Purdon, 1931).

We are dealing, therefore, with a situation in which the controlling statute explicitly makes the circumstances of the particular case determine whether failure to pay the price of one shipment delivered under an installment contract justifies the seller in treating his own obligation with reference to future installments as ended. Our problem is how to determine the legal effect of non-payment in a particular case.

We think the key is to found in the rational basis of the statute itself. The flexibility of the statute reflects the impossibility of generalization about the consequences of failure to pay promptly for installments as delivered. Yet, the commercial sense of the statute yields two guiding considerations. First, non-payment for a delivered shipment may make it impossible or unreasonably burdensome from a financial point of view for the seller to supply future installments as promised. Second, buyer's breach of his promise to pay for one installment may create such reasonable apprehension in the seller's mind concerning payment for future installments that the seller should not be required to take the risk involved in continuing deliveries. If any such consequence is proved, the seller may rescind. Moreover, the Pennsylvania decisions indicate that these embarrassments and apprehensions are normal conse-

quences of non-payment; but the cases also make it clear that they are not necessary consequences. American Tube & Stamping Co. v. Erie Iron & Steel Co., 1924, 281 Pa. 10, 125 A. 304; G. B. Hurt, Inc., v. Fuller Canneries Co., 1920, 269 Pa. 85, 112 A. 148; Cf., Helgar Corp. v. Warner's Features, Inc., 1918, 222 N.Y. 449, 119 N.E. 113.

In this case there is no evidence that the delay in payment for one carload made it difficult to provide additional lead. To the contrary, seller admits that throughout the period in controversy he had sufficient lead on hand for the full performance of this contract. He could have delivered had he chosen to do so. His excuse, if any, must be found in reasonable apprehension as to the future of the contract engendered by buyer's behavior.

The district court's finding number 16, with which seller takes issue, is a direct negation of the claim of reasonable apprehension upon which seller seeks to establish under Section 45 of the Sales Act his asserted "right to treat the whole contract as broken." It reads as follows: "Plaintiff's claim of fear that the defendant would not pay for the balance of battery lead due under Contract No. 5794 at the contract price was without foundation and unreasonable."

In considering the propriety of this finding, it is to be borne in mind that the point here is not the absence of legal justification for the withholding of an overdue payment but rather whether, under the circumstances, that withholding gave the seller reason to believe that there was likelihood of continuing or additional default when and after he should deliver the rest of the lead in accordance with his promise. The substantiality of this alleged apprehension must be judged in the light of the uncontroverted finding that no impairment of buyer's credit had been shown. Moreover, the market was rising and all of the evidence indicates that buyer needed and urgently requested the undelivered lead. Indeed, as early as March 1, before the delivery of the carload for which payment was withheld, the buyer had complained quite urgently of the non-delivery of the

entire balance of some 290,000 pounds overdue since December. Thereafter, when the seller shipped 43,000 pounds, about one-seventh of what was due, the buyer insisted that he was withholding payment because of the delay in delivery of the overdue balance. The court's finding that buyer had waived any claim for damages for delay up to that time does not alter this factual picture or its rational implications. In these circumstances, the trial court was justified in concluding that buyer's explanation of his conduct merited belief and that seller had no valid reason to be fearful that payment would not be forthcoming upon full delivery.

The clincher here is provided by the additional evidence concerning the possibility of delivery with sight draft attached. While there is no specific finding on the point, the evidence, including testimony tendered on behalf of seller, shows without dispute that at the beginning of this series of contracts, the seller had the privilege of shipping on sight draft but elected not to do so. And just before the collapse of the efforts of the parties to work out their difficulties amicably, the buyer specifically proposed that the seller assure himself of prompt payment by the use of sight drafts accompanying shipments. It is again important that at this time the market was substantially higher than the contract price and that seller was advised of buyer's urgent need for lead to meet his own commitments. In such circumstances it is incredible that the buyer would refuse to honor sight drafts for the contract price. These facts considered together leave no basis for reasonable apprehension concerning payment.

There is one other relevant and important fact. Throughout the controversial period the seller, with a stock of lead on hand adequate for the full performance of this contract, was using this lead in a rising market for sales to other purchasers at prices higher than agreed in the present contract. The inference was not only allowable but almost inescapable that desire to avoid a bad bargain rather than apprehension that the buyer would not carry out that bargain caused the seller to renounce

the agreement and charge the buyer with repudiation. Recission for such cause is not permissible. See Truitt v. Guenther Lumber Co., 1920, 73 Pa.Super. 445, 450.

It follows that the seller has failed to establish justification for recission under Section 45 of the Sales Act and that judgment for the buyer on the counterclaim was proper.

The judgment will be affirmed.