**UNITED STATES for the Use of ASCHER CORPORATION, a Corporation, Appellant,**

v.

**BRADLEY–DODSON CO., a Partnership, et al., Appellees.**

No. 16370.

United States Court of Appeals
Eighth Circuit.

Aug. 16, 1960.

Charles A. Nye, Omaha, Neb., for appellant.

Donald R. Ross, Omaha, Neb., for appellees.

Before GARDNER, WOODROUGH and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

This action under the Miller Act, 40 U.S.C. § 270a to 270e, is brought by Ascher Corporation, as use-plaintiff, against Bradley-Dodson Co., a partnership, and the surety upon the latter's payment bond. Jurisdiction is established.

Bradley-Dodson, referred to herein as the defendant, was the successful bidder in 1953 for the construction of an electrical distribution system at the Lincoln Air Force Base in Nebraska. Ascher sold the defendant the primary cable needed for this work. The cable was installed, was rejected by the Army Engineers, and was removed and replaced. The action, so far as pertinent here, is for the unpaid portion of the purchase price of that cable. The defendant by its amended answer alleged that the cable failed to meet the government specifications that it be shielded and, alternatively, that it was not of merchantable quality. The plaintiff by its amended reply denied the application of the government specifications. The defendant counterclaimed for the additional cost it incurred for replacement cable and for amounts already paid to Ascher for the original cable.

The parties stipulated that the cable furnished by Ascher to the defendant was not shielded and thus did *not* conform to the government specifications.

The case was tried to the court. Judgment was rendered for the defendant on both the main claim and the counterclaim. The plaintiff has appealed.

Ascher's position is that the government specifications were never submitted to it although there were formal references to them in correspondence; that in effect there were other specifications privately formulated and agreed upon by the parties; that the cable it furnished conformed to those substitute specifications; and that in any event the defendant accepted the cable and is not in a position to rescind its contract.

The case presents the following questions: (1) Under the contract between the parties was Ascher required to furnish shielded cable? (2) If so, is Ascher responsible for the difference between the price of the cable it supplied and the greater cost to the defendant of replacement shielded cable? (3) Was the cable of merchantable quality?

■ 1. We are aware that, as suggested by the plaintiff, the furnishing of supplies not in conformity with specifications does not, in and of itself and as a matter of law, defeat the obligation of the prime contractor to pay for those supplies or render the Miller Act unavailable to the supplier. Dow v. United States, 10 Cir., 154 F.2d 707, 709; United States for Use of Ardmore Concrete Material Co. v. Williams, 10 Cir., 240 F.2d 561, 564. We are also aware that the Miller Act is to be liberally construed, United States for Benefit and on Behalf of Sherman v. Carter, 353 U.S. 210, 216, 77 S.Ct. 793, 1 L.Ed.2d 776, and that its benefits are available even though the materials supplied are not directly or ultimately incorporated into the project. United States for Use and Benefit of Westinghouse Electric Supply Co. v. Endebrock-White Co., 4 Cir., 275 F.2d 57, 60; Glassell-Taylor Co. v. Magnolia Petroleum Co., 5 Cir., 153 F.2d 527, 529; United States for Use of Ardmore Concrete Co v. Williams, supra.

Our initial question here, however, is whether the contract between these parties, that is, the defendant's order which was accepted by Ascher, embraced the specifications for shielded cable and an accompanying guaranty. The trial court held that it did.

The government contract was awarded to the defendant on May 13, 1953. It incorporated specifications numbered ENG-25-066-53-113 stating in part:

"4.07. Primary Cable System. The primary cable system shall consist of polychloroprene-sheathed cable, * * * Polychloroprene-sheathed cables shall conform to the applicable requirements of the latest edition of IPCEA.[1] Conductor insulation for polychloroprene sheathed cables shall be suitable for a maximum operating temperature of 75° C. for 5 KV cable, shall be moisture-resistant, and shall be ozone-resistant grade of insulation for 5 KV cables. Polycholoroprene sheathed cable shall be shielded in accordance with the recommendation of the latest edition of IPCEA, and the method of accomplishment shall be in accordance with the current practice of industry." [2]

Within the next 2 days Newton Weiss, who was Ascher's sales manager and who possessed authority to act on behalf of Ascher, telephoned to Ed Bradley, a partner in the defendant, to solicit an order for cable required on the Lincoln project. Although Bradley was initially somewhat adverse to dealing with so distant a supplier, a written order was sent to Ascher by Bradley on June 16, 1953, and was accepted by Weiss on the following day. There is testimony as to various negotiatory letters and conversations between May 15 and June 16; some are challenged by the parties as to their existence and import. Since their interpretation is decisive of the first factual issue, we mention them chronologically rather than in summary:

a. May 14 or 15, 1953. Weiss telephoned Bradley a second time. Bradley testified that during this conversation

1. Insulated Power Cable Engineers Association.

2. Although of no significance here, because the parties have stipulated that the cable supplied was not shielded, it may be helpful to note that the term "shielded cable" apparently refers to cable which has a metallic or non-metallic guard wrapped around the electrical conductor. Its purpose is to confine the electrostatic field within the cable's insulation in order to reduce the hazard of shock and to impede the process of deterioration. Metallic shielding is grounded to remove the electrical excesses while non-metallic shielding accomplishes the same effect by restraining the excesses within the cable.

Weiss asked him to read the government specifications concerning shielding and that he did read them to Weiss. Weiss denied this aspect of that conversation.

b. May 15, 1953. Letter from Ascher (Weiss) to defendant quoting prices for electrical materials. This letter makes no reference to shielded cable.

c. May 15, 1953. H. P. Underwood, an accountant employed by the defendant, testified that on this day he sent a copy of the government specifications to Ascher by first class mail posted from Omaha. Sufficient postage was attached and a proper return address was affixed. There was no accompanying letter of transmittal. These specifications were not returned to the defendant. Weiss denied receiving them.

d. May or June, 1953. Sam C. Dodson, an employee but not a partner of the defendant, testified that he had 2 telephone conversations with Weiss and that he read the cable specifications to Weiss. Weiss also denied this.

e. May 29, 1953. Letter from defendant (Bradley) to Ascher requesting quotations for specified electrical materials. These included "4/0–5 KV for duct", "2/0–5 KV for duct", and "6–5 KV wire for duct". The reference at the top of the letter read: "RE: Utilities Electrical Distribution, Serial No. ENG–25–066–53–113, Lincoln Air Force Base, Lincoln, Nebr." The letter itself stated "This quotation is to be based upon the following stipulations: Will meet all requirements of the above subject specifications. * * *"

f. June 4, 1953. Letter from Ascher (Weiss) to defendant. This supplied the requested quotations, contained the same reference in its heading to the serial number of the specifications, and repeated the cable descriptions. It made no other reference to the specifications.

g. June 16, 1953. Letter from the defendant (Bradley) to Ascher. This enclosed the order for the cable. The letter stated:

"It will be necessary to send us samples of the 5 KV wire and cables.

These will be submitted to the U. S. Engineers for their approval. It is understood the validity of the orders for subject items will depend upon the approval of these items by the proper authorities."

The accompanying order included references to "4/0 5 KV cable", "2/0 5 KV cable", and "6 5 KV stranded". It stated "This quotation is to be based upon the following stipulation:—Will meet all requirements of subject specifications. * * *" The order in its heading referred to "Job: US ENG–25–066–53–113". The requested samples were not furnished by Ascher.

h. June 16, 1953. Handwritten work sheet prepared by Weiss bearing this date, and from which an order for cable was placed by Ascher with its own supplier, Hatfield Wire & Cable, Hillside, New Jersey. This contained the statement "Wire to conform to Lincoln Air Force Base ENG 25–066–53–113".

i. June 17, 1953. Ascher (by Weiss) accepted the defendant's order in writing and returned a copy of it to the defendant.

j. June 24, 1953. Letter from Ascher (Weiss) to the defendant confirming a telephone conversation. This letter referred to the order of June 16 said to be placed "in accordance with the following specifications" of insulation and jacketing (polychloroprene neoprene) for the cable ordered.

k. June 30, 1953. Letter from defendant (Bradley) to Ascher which read in full:

"The RHRW Neoprene jacketed 5000 V cable for direct burial, has been accepted by the U. S. Army Corps of Engineers, for subject contract.

"Please inform your supplier so that fabrication can start without further delay."

This letter did not contain a reference to the government specifications or their number. It was sent after a conference by Bradley with Herbert Stern of the Engineering Corps. During this confer-

ence samples, not supplied by Ascher, of this type of cable were shown. Earl W. Fiala, Area Engineer, testified, however, that his office had never approved the cable.

At the trial there was expert testimony that it is a general practice in the industry to submit an order based on meeting specifications not completely stated in the order and to furnish copies of these specifications to the firm receiving the order.

The foregoing chronological review shows that we have evidence here of both oral and written notice to Ascher of the existence of the government's specifications and of their content, that we have evidence that the order was based upon the specifications, and that we have evidence that the ordering method employed conformed to the general practice in the trade. While Weiss testified that he had no notice of the specifications and their requirement that the cable be shielded, while there was testimony that it is a consistent industry practice that shielded cable be identified as such, and while Ascher argues that its letter of June 24 and the defendant's letter of June 30 embrace other and the real specifications as between the parties, and that the correspondence in its entirety establishes an agreement "unhinged to the Government contract specifications", we cannot fail to be impressed by the direct references by number to the governing specifications in the letters of May 29 and June 4, in the order of June 16, and in Weiss' work sheet, also of June 16, in his own handwriting. The oral testimony of Dodson and of the accountant is supporting. There is actually very little evidence (apart from Weiss himself and apart from a possible inference from plaintiffs' low cost quotations) which is not fully consistent with Ascher's awareness that the government specifications required shielded cable and that shielding was clearly contemplated by the defendant's order. Surely Weiss, experienced as he claimed to be in dealing with "persons with Government work", must have had an informed awareness of the significance of the symbol numbers employed and the governing character of the specifications.

■■ It is settled that in a non-jury case this court may not set aside a trial court's finding of fact unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law. Neely v. Boland Manufacturing Co., 8 Cir., 274 F.2d 195, 201; Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190; Fed.Rules Civ.Proc. rule 52 (a), 28 U.S.C.A. We have no hesitancy in concluding that there is substantial evidence in the record here for the trial court's finding on this point.

2. The court, in granting judgment for the defendant on Ascher's claim and on the counterclaim necessarily held that the defendant properly and effectively had rescinded its contract with the plaintiff.

Delivery of the Hatfield cable to Bradley-Dodson was completed by November 24, 1953. Installation began 6 days later. Certain factors bearing upon the acquisition of knowledge by the defendant of the fact the cable was not shielded, upon the time that knowledge was acquired and upon the defendant's acceptance of the cable deserve mention:

a. Ralph L. Kerr, an electrical engineer on duty with the Army at the Base, testified that he determined within two or three days after delivery and before installation, that the cable was not shielded and that he advised either Bradley or S. C. Dodson that the cable accordingly did not meet the specifications. Bradley admitted this conversation but claimed that it occurred subsequent to installation.

b. Neither Bradley nor, apparently, any other partner or employee of the defendant examined the cable before installation to ascertain whether it was shielded.

c. The official government log for the project showed an awareness as of December 8, 1953, that the cable being used

was not shielded and therefore was considered as not acceptable. It also showed that on December 21 there was a conference with Bradley at which the use of non-shielded cable was discussed and that "This is being taken up through channels".

d. January 29, 1954. Letter from the defendant (S. C. Dodson) to Ascher stating that the cable "has apparently been rejected" because "it does not have proper shielding". Construction data was requested and reference was made to the notation on the order relative to specifications.

e. February 1, 1954. Letter from Ascher (Weiss) to defendant enclosing Hatfield specifications, giving assurance that the cable would be found satisfactory and suggesting that defendant "do what you can to pacify" the inspector. Weiss testified that by "pacifying" him he meant to see if it could be found out what was wrong or "if it was not too far from the specifications, whether he would accept it anyway".

f. February 3, 1954. Letter from Area Engineer Fiala to the defendant specifically stating that investigation revealed that the cable did not meet specifications, requesting the procurement of acceptable cable and directing replacement after approval.

g. February 11, 1954. Letter from the defendant (Bradley) to Ascher stating that the defendant had been notified that the cable did not meet specifications, requesting cable of an approved type, demanding that plaintiff bear the expense of removal and reinstallation and penalties, and offering to return the present cable as directed.

h. Bradley testified that he had not previously used shielded cable and that he did not examine the cable shipment before installation to see if it was shielded. He also said that he asked Kerr whether the supplied cable was unshielded and that Kerr said that he could not tell until tests were made.

i. The IPCEA shielding regulations specify the method of grounding shielded cable and state "grounding of the shield is the responsibility of the purchaser or user of the cable".

■ The trial court held that the absence of shielding would have been detected upon any competent inspection and must inevitably have been observed by those employees of the defendant who installed it. Knowledge of lack of conformity with the requirement of the specifications for shielding was thus imputed to the defendant.

Without deciding and in spite of opposing testimony, we accept for present purposes this conclusion of the trial court. This leads us to the question of the propriety of the court's further determination that the defendant by its letter of February 11 gave Ascher timely notice of the defect.

■ The law of Nebraska, where the alleged acceptance and rescission by the defendant took place, is applicable here.[3] Nebraska has adopted the Uniform Sales Act. R.R.S.Neb.1943, Chapter 69, Article 4. §§ 69–448 and 69–449 of the Act together define acceptance on the part of the buyer and preserve, in spite of acceptance, his legal remedies.[4] The right to rescind, however, whether

**3.** Plotnick v. Pennsylvania Smelting & Refining Co., 3 Cir., 194 F.2d 859, 861; Central Hanover Bank & Trust Co. v. Siemens & Halske G., D.C.S.D.N.Y., 15 F.Supp. 927, 929; affirmed 2 Cir., 84 F. 2d 993, certiorari denied 299 U.S. 585, 57 S.Ct. 110, 81 L.Ed. 431; Sistrom v. Anderson, 51 Cal.App.2d 213, 218, 124 P.2d 372, 375; Restatement, Conflict of Laws, §§ 358, 359, 370; 50 A.L.R.2d 254; see Hal Roach Studios v. Film Classics, 2 Cir., 156 F.2d 596, 598.

**4.** § 69–448. "The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, or when the goods have been delivered to him, and he does any act in relation to them which is inconsistent with the ownership of the seller, or when, after the lapse of a reasonable time, he retains the goods without intimating to the seller that he has rejected them."

§ 69–449. "In the absence of express or implied agreement of the parties, ac-

for breach of warranty or for failure of the goods purchased to conform to the contract, can be lost, and it is lost if the property is used by the buyer as his own, and not merely for testing or preserving it, after he has knowledge of the grounds for rescission, Hazen v. Wilhelmie, 68 Neb. 79, 93 N.W. 920, 921; Von Dohren v. John Deere Plow Co., 71 Neb. 276, 98 N.W. 830, 832; United States Supply Co. v. Vlasnik, 80 Neb. 53, 113 N.W. 813; Patrick v. Norfolk Lumber Co., 81 Neb. 267, 115 N.W. 780, 782; 46 Am.Jur., Sales, § 765, or if he fails to notify the seller of his intention to rescind within a reasonable time, Sedlacek v. Welpton Lumber Co., 111 Neb. 677, 197 N.W. 618; McGuire v. Thompson, 152 Neb. 28, 40 N.W.2d 237, 243.

The Nebraska court, in the case last cited, although making no reference to the statute, said:

"The question as to what is a reasonable time for rescission of a contract is not an abstract question which can be answered merely by reference to a certain period of time, but depends on the particular circumstances, as the subject matter, the relation and location of the parties, their opportunities for communication, change in condition of the property or injury to the seller by delay, and any other factors which bear on the issue as to what should reasonably be expected or required. * * *

"Since the question of what is a reasonable time for rescission by the purchaser of a chattel for fraud or a breach of warranty inducing the purchase depends on the facts of a particular case, and is frequently matter from which different conclusions may reasonably be drawn, it is well settled that ordinarily the question is one of fact for the jury."

It is thus evident that under Nebraska law rescission must be within a reasonable time, that what is a reasonable time depends on the circumstances of the case, and that its determination is ordinarily one for the trier of fact.

In determining the question of timeliness here we are impressed by three factors. The first is the hesitancy and delay of the government formally to reject the cable. The log notations of December 8 and 21, 1953, intimate awareness on the part of government inspectors as to the non-shielded character of the cable and speak of it being taken up "through channels". On January 6, 1954, the log indicates that the government was "asking for credit" on the cable. Formal rejection is made only on February 3 and written notification to Ascher followed on February 11. The second factor is Ascher's constant awareness of the developing situation. This is evidenced, among other things, by its own letter of December 30 to its supplier Hatfield asking for specifications of the cable to supply the contractor at the Base; by the defendant's letter of January 29 to Ascher stating that "the cable has apparently been rejected" and requesting construction data; by Hatfield's letter of February 1 to Ascher to the effect that the cable was not shielded and that no shielding was requested; and by Ascher's letter of the same date to the defendant. The third factor is Ascher's own encouragement and participation in the attempts to secure acceptance of the cable by the government engineers. This is evidenced particularly by its letter of February 1 to the defendant suggesting that the inspector be pacified, and stating that the cable "was manufactured in accordance with specifications" and should be "very suitable". Obviously Ascher was endeavoring to save the situation

ceptance of the goods by the buyer shall not discharge the seller from liability in damages, or other legal remedy, for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer

fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

and the contract in the face of knowledge of impending trouble.

In view of these facts, we are convinced that, in the light of the standards prescribed by the Supreme Court of Nebraska, the defendant here effectively rescinded its contract with Ascher. While more than two months elapsed between the final shipment of cable (November 24, 1953) and the written notice to Ascher of formal rejection (February 11, 1954), the government's slowness, undoubtedly completely justified, in rejecting the cable, Ascher's awareness of the situation, and Ascher's endeavors to obtain acceptance of the cable, all support a conclusion of timeliness and persuade us that the Nebraska court, were this case before it, would regard the contract as rescinded.[5] In any event, even if this could be characterized as a doubtful question of state law, we feel that the trial court on this issue reached a permissible conclusion, Homolla v. Gluck, 8 Cir., 248 F.2d 731, 733; Knapp v. Styer, 8 Cir., 1960, 280 F.2d 384, which is not to be disturbed on appeal.

These conclusions make it unnecessary for us to consider the defendant's alternative contention that most of the cable was not of merchantable quality.

Affirmed.

WOODROUGH, Circuit Judge (dissenting).

This action was brought to recover the contract price of wire sold and delivered to defendant by plaintiff upon defendant's written order. On receiving the wire manufactured in accord with the order the defendant used it by cutting it up and burying it in the ground in position on the works to carry electrical currents. On request for payment, defendant denied liability to pay the agreed purchase price or any part and counterclaimed for damages for breach of contract. Judgment was for defendant.

On the trial of the case to the Court without a jury it appeared that the defendant had a construction contract with the government which called for a special kind of wire covered with metal shielding, plainly distinguishable on sight and much more costly than the commoner wire described in defendant's written order and delivered by plaintiff in accord with the order. Defendant claimed, however, that it told plaintiff's agent over the telephone exactly the kind of wire that was specified in the construction contract and also that it mailed the plaintiff a copy of those specifications. Defendant's witness said the copy was mailed all by itself in an addressed and stamped envelope. Defendant's position was that because plaintiff knew of the kind of wire the government's contract with defendant called for plaintiff became obligated though it never agreed to deliver that kind of wire to defendant for the price of the cheaper wire which the plaintiff had described and offered defendant and which defendant ordered by the same description.

On the other hand, it was shown that before the manufacture of the wire for defendant, defendant wrote plaintiff that wire conforming to the description of defendant's order had been accepted for the defendant's government contract by the U. S. Army Corps of Engineers. It was also shown that the supplier of the wire, the Hatfield Wire and Cable Co., a division of Continental Copper and Steel Industries, Inc., a large manufacturer of wire products "was not set up" to make the more costly type of shielded wire and would never have taken a contract to do so.

Plaintiff never received any copy of the defendant's contract with the government. Defendant had only two copies of the specifications for its whole construction job and the specifications therein for wire covered no more than a page or two. It is not credible that defendant sent plaintiff the entire specifications

---

5. Compare this court's recent case of Adler Construction Co. v. United States, 8 Cir., 270 F.2d 715, where it was held

as a matter of law, that notice was not timely under the South Dakota version of the Uniform Sales Act.

with no accompanying writing or record whatever. The price at which defendant ordered and plaintiff delivered the wire was fully a third less than the special shielded wire specified in the government contract could be had for.

In any event, when defendant received the wire it ordered from plaintiff it was apparent and defendant could not fail to see that the wire was not shielded as called for by the government contract. The defendant chose to take the wire sent to it pursuant to its order and to cut it up and bury it.

I would reverse the judgment.