The SELMER COMPANY, Plaintiff-Appellant,

v.

BLAKESLEE–MIDWEST COMPANY, Westinghouse Electric Corporation, and Federal Insurance Company, Defendants-Appellees.

No. 82–2493.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1983.

Decided March 29, 1983.

**926**

Gerald C. Nichol, Madison, Wis., for plaintiff-appellant.

Brian D. Baird, Borgelt, Powell, Peterson & Frauen, S.C., Milwaukee, Wis., for defendants-appellees.

Before CUMMINGS, Chief Judge, and CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

This appeal by the plaintiff from summary judgment for the defendants in a diversity case requires us to consider the meaning, under Wisconsin contract law, of "economic duress" as a defense to a settlement of a contract dispute.

On this appeal, we must take as true the following facts. The plaintiff, Selmer, agreed to act as a subcontractor on a construction project for which the defendant Blakeslee-Midwest Prestressed Concrete Company was the general contractor. Under the contract between Blakeslee-Midwest and Selmer, Selmer was to receive $210,000 for erecting prestressed concrete materials supplied to it by Blakeslee-Midwest. Blakeslee-Midwest failed to fulfill its contractual obligations; among other things, it was tardy in supplying Selmer with the prestressed concrete materials. Selmer could have terminated the contract without penalty but instead agreed orally with Blakeslee-Midwest to complete its work, provided Blakeslee-Midwest would pay Selmer for the extra costs of completion due to Blakeslee-Midwest's defaults. When the job was completed, Selmer demanded payment of $120,000. Blakeslee-Midwest offered $67,000 and refused to budge from this offer. Selmer, because it was in desperate financial straits, accepted the offer.

Two and a half years later Selmer brought this suit against Blakeslee-Midwest (the other defendants' liability, being derivative from Blakeslee-Midwest's, does not require separate consideration), claiming that its extra costs had amounted to $150,-000 ($120,000 being merely a settlement offer), and asking for that amount minus the $67,000 it had received, plus consequential and punitive damages. Although Selmer, presumably in order to be able to claim such damages, describes this as a tort rather than a contract action, it seems really to be a suit on Blakeslee-Midwest's alleged oral promise to reimburse Selmer in full for the extra costs of completing the original contract after Blakeslee-Midwest defaulted. But the characterization is unimportant. Selmer concedes that, whatever its suit is, it is barred by the settlement agreement if, as the district court held, that agreement is valid. The only question is whether there is a triable issue as to whether the settlement agreement is invalid because procured by "economic duress."

 If you extract a promise by means of a threat, the promise is unenforceable. This is not, as so often stated, see, e.g., *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.*, 584 P.2d 15, 22 (Alaska 1978), because such a promise is involun-

tary, unless "involuntary" is a conclusion rather than the description of a mental state. If the threat is ferocious ("your money or your life") and believed, the victim may be desperately eager to fend it off with a promise. Such promises are made unenforceable in order to discourage threats by making them less profitable. The fundamental issue in a duress case is therefore not the victim's state of mind but whether the statement that induced the promise is the kind of offer to deal that we want to discourage, and hence that we call a "threat." Selmer argues that Blakeslee-Midwest said to it in effect, "give up $53,-000 of your claim for extras [$120,000 minus $67,000], or you will get nothing." This has the verbal form of a threat but is easily recast as a promise innocuous on its face— "I promise to pay you $67,000 for a release of your claim." There is a practical argument against treating such a statement as a threat: it will make an inference of duress inescapable in any negotiation where one party makes an offer from which it refuses to budge, for the other party will always be able to argue that he settled only because there was a (figurative) gun at his head. It would not matter whether the party refusing to budge was the payor like Blakeslee-Midwest or the promisor like Selmer. If Selmer had refused to complete the job without being paid exorbitantly for the extras and Blakeslee-Midwest had complied with this demand because financial catastrophe would have loomed if Selmer had walked off the job, we would have the same case. A vast number of contract settlements would be subject to being ripped open upon an allegation of duress if Selmer's argument were accepted.

Sensitive—maybe oversensitive—to this danger, the older cases held that a threat not to honor a contract could not be considered duress. See, e.g., *Sistrom v. Anderson,* 51 Cal.App.2d 213, 124 P.2d 372, 376 (Cal.App.1942); cf. *Batavian Bank v. North,* 114 Wis. 637, 645–46, 90 N.W. 1016, 1019 (1902). But the principle was not absolute, as is shown by *Alaska Packers' Ass'n v. Domenico,* 117 Fed. 99 (9th Cir.1902). Sailors and fishermen (the libelants) "agreed in writing, for a certain stated compensation, to render their services to the appellant in remote waters where the season for conducting fishing operations is extremely short, and in which enterprise the appellant had a large amount of money invested; and, after having entered upon the discharge of their contract, and at a time when it was impossible for the appellant to secure other men in their places, the libelants, without any valid cause, absolutely refused to continue the services they were under contract to perform unless the appellant would consent to pay them more money." *Id.* at 102. The appellant agreed, but later reneged, and the libelants sued. They lost; the court refused to enforce the new agreement. Although the technical ground of decision was the absence of fresh consideration for the modified agreement, it seems apparent both from the quoted language and from a reference on the same page to coercion that the court's underlying concern was that the modified agreement had been procured by duress in the form of the threat to break the original contract. Cf. Farnsworth, Contracts 271 (1982).

*Alaska Packers' Ass'n* shows that because the legal remedies for breach of contract are not always adequate, a refusal to honor a contract may force the other party to the contract to surrender his rights—in *Alaska Packers' Ass'n,* the appellant's right to the libelants' labor at the agreed wage. It undermines the institution of contract to allow a contract party to use the threat of breach to get the contract modified in his favor not because anything has happened to require modification in the mutual interest of the parties but simply because the other party, unless he knuckles under to the threat, will incur costs for which he will have no adequate legal remedy. If contractual protections are illusory, people will be reluctant to make contracts. Allowing contract modifications to be voided in circumstances such as those in *Alaska Packers' Ass'n* assures prospective contract parties that signing a contract is not stepping into a trap, and by thus encouraging people to make contracts promotes the efficient allocation of resources.

■ *Capps v. Georgia Pac. Corp.,* 253 Or. 248, 453 P.2d 935 (1969), illustrates the principle of *Alaska Packers' Ass'n* in the context of settling contract disputes. The defendant promised to give the plaintiff, as a commission for finding a suitable lessee for a piece of real estate, 5 percent of the total rental plus one half of the first month's rent. The plaintiff found a suitable lessee and the lease was signed. Under the terms of the commission arrangement the defendant owed the plaintiff $157,000, but he paid only $5,000, and got a release from the plaintiff of the rest. The plaintiff later sued for the balance of the $157,000, alleging that when requesting payment of the agreed-upon commission he had "informed Defendant that due to Plaintiff's adverse financial condition, he was in danger of immediately losing other personal property through repossession and foreclosure unless funds from Defendant were immediately made available for the purpose of paying these creditors." 253 Or. at 252, 453 P.2d at 937. But "Defendant, through its agent ..., advised Plaintiff that though he was entitled to the sums demanded in Plaintiff's Complaint, unless he signed the purported release set forth in Defendant's Answer, Plaintiff would receive no part thereof, inasmuch as Defendant had extensive resources and powerful and brilliant attorneys who would and could prevent Plaintiff in any subsequent legal proceeding from obtaining payment of all or any portion of said sums." *Id.* We can disregard the reference to the defendant's "powerful and brilliant attorneys" yet agree with the Oregon Supreme Court that the confluence of the plaintiff's necessitous financial condition, the defendant's acknowledged indebtedness for the full $157,000, and the settlement of the indebtedness for less than 3 cents on the dollar—with no suggestion that the defendant did not have the money to pay the debt in full—showed duress. The case did not involve the settlement of a genuine dispute, but, as in *Alaska Packers' Ass'n,* an attempt to exploit the contract promisee's lack of an adequate legal remedy.

■ Although *Capps* is not a Wisconsin case, we have no reason to think that Wisconsin courts would reach a different result. Cf. *Mendelson v. Blatz Brewing Co.,* 9 Wis.2d 487, 494, 101 N.W.2d 805, 809 (1960); *Wurtz v. Fleischman,* 97 Wis.2d 100, 109–11, 293 N.W.2d 155, 160 (1980). But the only feature that the present case shares with *Capps* is that the plaintiff was in financial difficulties. Since Blakeslee-Midwest did not acknowledge that it owed Selmer $120,-000, and since the settlement exceeded 50 percent of Selmer's demand, the terms of the settlement are not unreasonable on their face, as in *Capps.* Thus the question is starkly posed whether financial difficulty can by itself justify setting aside a settlement on grounds of duress. It cannot. "The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions." *Johnson, Drake & Piper, Inc. v. United States,* 531 F.2d 1037, 1042 (Ct.Cl.1976) (per curiam). The adverse effect on the finality of settlements and hence on the willingness of parties to settle their contract disputes without litigation would be great if the cash needs of one party were alone enough to entitle him to a trial on the validity of the settlement. In particular, people who desperately wanted to settle for cash—who simply could not afford to litigate—would be unable to settle, because they could not enter into a *binding* settlement; being desperate, they could always get it set aside later on grounds of duress. It is a detriment, not a benefit, to one's long-run interests not to be able to make a binding commitment.

■ Matters stand differently when the complaining party's financial distress is due to the other party's conduct. Although Selmer claims that it was the extra expense caused by Blakeslee-Midwest's breaches of the original contract that put it in a financial vise, it could have walked away from the contract without loss or penalty when Blakeslee-Midwest broke the contract. Selmer was not forced by its contract to remain on the job, and was not prevented by circumstances from walking away from the contract, as the appellant in *Alaska Pack-*

*ers' Ass'n* had been; it stayed on the job for extra pay. We do not know why Selmer was unable to weather the crisis that arose when Blakeslee-Midwest refused to pay $120,000 for Selmer's extra expenses— whether Selmer was undercapitalized or overborrowed or what—but Blakeslee-Midwest cannot be held responsible for whatever it was that made Selmer so necessitous, when, as we have said, Selmer need not have embarked on the extended contract.

■ To assimilate this case to one of the conventional categories of duress Selmer argues that Blakeslee-Midwest withheld $21,000 in "retainage" in order to force Selmer to settle the dispute over the extras, and in thus withholding Selmer's property was guilty of "duress of goods," see, e.g., *Williams v. Phelps,* 16 Wis. 80, 85 (1862); *Sistrom v. Anderson, supra,* 124 P.2d at 376, rather than merely of a refusal to settle a contract dispute. Many construction contracts, including this one, allow the payor to retain 10 percent of any advance payments due under the contract as security for the contractor's completing the job. At the completion of the job the amount retained must of course be paid the contractor. To have held the retainage back with no justification at all, merely to force Selmer to yield on its dispute over the extras, might well have been duress, since Blakeslee-Midwest is alleged to have known of Selmer's desperate circumstances.

■ The precise allegation concerning retainage, however, is that Blakeslee-Midwest's take-it-or-leave-it offer of $67,000 included the retainage of $21,000. Since the retainage was 10 percent of the contract price, Selmer must have received 90 percent of the price, or $189,000, and that plus $67,000 would equal $256,000. But Selmer in fact received a total of $280,000 from Blakeslee-Midwest. As this must have included the retainage, the retainage allegation was discredited and so did not create a triable issue. It might of course have been duress for Blakeslee-Midwest to say to Selmer, "we will give you your retainage of $21,000 plus $67,000 if and only if you abandon your claim for any additional extra

payments," but that is not Selmer's contention. It says it was offered $67,000 including the retainage—not that it was offered $88,000—and this is inconsistent with the uncontradicted evidence that the entire contract price of $210,000 was paid plus the $67,000 in extras. Moreover, Selmer waived its subcontractor's lien, indicating it had been paid in full. This waiver, incidentally, was signed after Selmer received the $67,000 it claims to have accepted under duress. This is additional evidence that Selmer was not acting under duress when it made the settlement that years later it tried to repudiate.

AFFIRMED.