**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-1334

STEPHANIE WALKER,

Plaintiff - Appellant,

v.

CITY OF CHARLOTTE, NORTH CAROLINA,

Defendant - Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Max O. Cogburn, Jr. District Judge (3:23-cv-00083-MOC-DCK)

Argued: December 11, 2025                    Decided: April 8, 2026

Before NIEMEYER, WYNN, and BENJAMIN, Circuit Judges.

Affirmed in part, reversed in part, and remanded by unpublished opinion. Judge Wynn wrote the opinion, in which Judge Benjamin joined. Judge Niemeyer wrote an opinion concurring in part and dissenting in part.

**ARGUED:** M. Shane Perry, WILLIAMS & PERRY PLLC, Mooresville, North Carolina, for Appellant. Steven Andrew Bader, CRANFILL SUMNER LLP, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Stephanie H. Webster, CRANFILL SUMNER LLP, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Under North Carolina law, a contract may be set aside if it was obtained through undue influence.

Stephanie Walker, an elderly widow with limited income, was left suddenly homeless when her Charlotte home was flooded with raw sewage from a sewer-system backup. The City of Charlotte offered $45,000 to Walker on the condition that she sign a release of any claims she might have against the City of Charlotte related to the incident. Walker initially protested but, lacking the money to make her home habitable and fearing that she would not survive living in her car, signed the release to pay for emergency repairs.

Because Walker has forecast evidence from which a jury could conclude that the release was obtained through undue influence, we reverse the district court's grant of summary judgment to the City of Charlotte.

I.

A.

Walker is a widow in her late seventies and lives in Charlotte, North Carolina. Her home connects to the Charlotte sewer system. In the early morning of February 15, 2022, sewage back flowed through her toilet, covering her home in several inches of raw sewage.

The City of Charlotte has a sewer backup policy, through which it can pay for property damage stemming from backups that originate in the Charlotte system. In February 2022, the policy authorized payments of up to $15,000. Payment through the policy program was contingent on the execution of a release of all claims, with a possible

2

exception for backups caused by the City of Charlotte's negligence.[1] The City of Charlotte initially offered Walker the full $15,000, along with recommendations for contractors.

Walker chose one of the contractors on the City of Charlotte's list, Cardinal Restoration. In the three days following the sewage backup, Cardinal performed basic mitigation work, such as removing most of the contaminated water and tearing out carpet, and it gave Walker a quote of $38,200 for repairs. Cardinal noted that "[c]ode updates required by the county and unforeseen damages could increase this expense." J.A. 140.[2] Additionally, Cardinal and Walker had already "discussed aggressive corner cutting, doing some work [herself], and careful selection of inexpensive materials," but there was not much room to decrease cost. J.A. 141. Walker did not have the money to pay Cardinal, and Cardinal would not start work until it was guaranteed payment.

At some point between then and June 2022, Walker was referred to counsel. Her counsel attempted to negotiate with the City of Charlotte, but the City of Charlotte maintained that it could not pay more than the policy limit. The local news also interviewed Walker several times and ran stories on her situation in June and July.

---

[1] The City of Charlotte agrees that the payment cap "did not apply if Charlotte's negligence caused the blockage." Response Br. at 2. And an initial release signed by Walker states that the document will not release Charlotte from claims "if it is determined that" Charlotte's negligence caused the blockage. J.A. 149. It is unclear how negligence would be determined without a lawsuit. Yet Charlotte stated at oral argument that Walker could not have accepted the $15,000 and then sued Charlotte for negligence to cover her damages above $15,000. Oral Arg. at 37:29–38:07, https://www.ca4.uscourts.gov/OAarchive/mp3/25-1334-20251211.mp3. It is undisputed that the final release, which was attached to the $45,000 payment, covered all claims arising from the sewer backup.

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

In August 2022, the Charlotte City Council updated the sewer backup policy and made the revisions retroactively effective as of January 1, 2022. The 2022 policy increased the payment cap to $45,000 and required claimants to release the City of Charlotte of any further liability for the sewer backup.

The City of Charlotte offered this increased amount to Walker in early July, before the policy was officially updated. Her counsel indicated that this amount would perhaps be sufficient to make Walker's home habitable, but it would not cover a significant portion of her other damages, including to her furniture and other personal property. But the City of Charlotte held firm, stating that any compensation for personal property would need to come out of the $45,000. A month later, the City of Charlotte rejected Walker's counsel's suggestion to settle for $65,000.

By August, six months after the backup, Walker had grown desperate. She was losing her alternate housing and would need to sleep in her car. Her counsel informed Charlotte that Walker was "in her late 70s and she won't last long living in her car." J.A. 154. Walker avers that she was "in fear for [her] life," that she "had nowhere else to go," and that she did not have the money to fix her home on the hope of recovering her repair costs through a lawsuit. J.A. 216.

On August 10, 2022, Walker signed a release and wrote under her signature, "I'm homeless and I don't have another choice!" J.A. 146. Charlotte responded that it could not accept the release because "it appears to intend to put the City on notice that the Release was not signed freely and under no duress." J.A. 147. Walker's counsel responded that the City of Charlotte was "already on notice that she has no options" because he had told the

4

City of Charlotte that "she is homeless and has no money to fix what the city has done." J.A. 155.

Walker needed the money: She attests that she "did not want to sign" but that she "thought about dying" and then executed a clean copy of the release "so that [she] would not be homeless any longer." J.A. 217; *accord id.* ("If I had had a choice, I would not have signed it."). The City of Charlotte then paid Walker $45,000. Cardinal repaired portions of Walker's home, though water and sewer issues persist.

B.

In February 2023, Walker sued the City of Charlotte, claiming that she had signed the release under undue influence and bringing negligence, nuisance, inverse condemnation, and takings claims. The City of Charlotte moved to dismiss, citing the release. The district court denied the motion, concluding that the issue of undue influence would be resolved at summary judgment.

In the order denying the motion to dismiss, the district court stated that it would "allow this matter to go to discovery on the issue of undue influence. That is, the parties may conduct discovery on the circumstances surrounding the settlement agreement in this matter." *Walker v. City of Charlotte*, No. 3:23-cv-83, 2023 WL 8421110, at *1 (W.D.N.C. Dec. 4, 2023). The parties disagreed about whether the order meant that discovery was limited only to the issue of undue influence and requested a discovery conference. In a pretrial order, the magistrate judge declined to hold a conference, stating that he had confirmed with the district court that discovery should be limited to undue influence.

5

After this limited discovery, the City of Charlotte moved for summary judgment. At the hearing, the district court explained that it would decide the motion on the issue of undue influence: "If the undue influence is not there, the case is over. If the undue influence is there, all the other [claims] are in play." J.A. 195.

The district court granted summary judgment for the City of Charlotte. It noted that Walker was represented by counsel, and the court considered her decision to remove her protest statement from the release as indicative of "her desire to strike a bargain so she could begin repairs on her home." *Walker v. City of Charlotte*, No. 3:23-cv-83, 2025 WL 2271428, at *2 (W.D.N.C. Apr. 1, 2025). The district court reviewed the history of negotiations and determined that the City of Charlotte's increased offers from $15,000 to $45,000 showed that Walker had some bargaining power. Though Walker may have been undercompensated, the district court noted that "settlement is inherently a compromise." *Id.* Finally, the district court determined that Walker's age and economic condition did not, on their own, show that the City of Charlotte had an "overpowering influence" over her. *Id.* at *3. Thus, the district court concluded that the evidence pointed "to a difficult but voluntary decision" by Walker to settle, knowing that the payment would not cover her full damages. *Id.*

Walker timely appealed.

## II.

Walker challenges the district court's decision to limit the scope of initial discovery and its subsequent grant of summary judgment.

6

We review the district court's discovery decision under an abuse-of-discretion standard, acknowledging that district courts have "considerable discretion in overseeing discovery." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019) (quoting *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 178 (4th Cir. 2014)). That discretion "extends as well to the manner in which it orders the course and scope of discovery." *Ardrey v. United Parcel Serv.*, 798 F.2d 679, 682 (4th Cir. 1986).

We review a "ruling on summary judgment de novo, applying the same legal standards as the district court and viewing the evidence in the light most favorable to the nonmoving party." *Edwards v. CSX Transp., Inc.*, 150 F.4th 232, 235 (4th Cir. 2025). And we review de novo questions of state contract law. *Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 257 (4th Cir. 2021); *see Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 205 (4th Cir. 2013).

### III.

First, Walker argues that the district court erred when it limited initial discovery to the issue of undue influence without hearing from the parties or performing an analysis under Rule 42(b) of the Federal Rules of Civil Procedure, which governs a district court's ability to bifurcate a trial on separate issues.[3] *See* Fed. R. Civ. P. 42(b) ("[T]he court may order a separate trial of one or more separate issues [or] claims[.]"). We disagree.

---

[3] Charlotte argues that Walker did not preserve this argument for appeal. But Rule 46 requires an objection only so far as the party had an "opportunity to do so when the ruling or order was made." Fed. R. Civ. P. 46. The district court *sua sponte* restricted

As an initial matter, Walker's reliance on Rule 42(b) is incorrect. To be sure, we have used the term "bifurcation" to refer to the decision to conduct either a trial or discovery in phases. *See, e.g.*, *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1043 (4th Cir. 2020) (referencing "bifurcated discovery"); *Burgess v. Goldstein*, 997 F.3d 541, 548 (4th Cir. 2021) (reviewing the bifurcation of trial, with discovery stayed until the conclusion of the first trial). Yet bifurcated trial and bifurcated discovery are different animals. Courts separate or bifurcate trials under Rule 42(b). *See Plyler v. Cox*, 145 F.4th 501, 513 (4th Cir. 2025). But it is Rule 26 that "vests the trial judge with broad discretion to . . . dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598–99 (1998) (explaining that the court sets "the timing and sequence of discovery" under Rule 26(d)). This sequencing may happen, for example, after the parties submit a discovery plan under Rule 26(f), when the court devises an appropriate pretrial order under Rule 16(b). *See* 8A *Wright & Miller's Federal Practice & Procedure* § 2047 (3d ed. 2010 & Supp. 2025).

That is what happened here. After the City of Charlotte moved to dismiss based on the release, and Walker opposed dismissal by raising the issue of undue influence, the district court denied the motion and stated that the parties could "conduct discovery on the circumstances surrounding the settlement agreement in this matter." J.A. 107. The parties disagreed about the interpretation of that sentence in their report of the Rule 26(f) meeting and requested a discovery conference. The court declined to hold a conference and

---

discovery in its order denying Charlotte's motion to dismiss, and the magistrate judge declined the parties' request for a discovery conference on the matter.

confirmed in the Rule 16(b) pretrial order that discovery would be limited to the issue of undue influence.

The district court did not abuse its discretion by restricting initial discovery to the issue of undue influence. Though a district court "may not, through discovery restrictions, prevent a plaintiff from pursuing a theory or entire cause of action," courts often order that discovery should first proceed on threshold issues. *Ardrey*, 798 F.2d at 682. For example, a court may restrict initial discovery to jurisdictional issues before merits issues, to individual claims before class claims, or to officer liability before municipal liability. *See, e.g.*, *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650–51 (4th Cir. 2018) (jurisdiction); *Ardrey*, 798 F.2d at 684–85 (individual claims); *Carter v. Baltimore County*, 95 F. App'x 471, 475 (4th Cir. 2004) (officer liability).

Here, the district court identified the validity of the release as a potentially dispositive, threshold issue. If Walker's undue-influence argument failed, the court would not reach the merits of the remainder of her suit. Thus, we conclude that the district court did not abuse its discretion by limiting initial discovery to the issue of undue influence.[4]

IV.

Second, Walker argues that the district court erred when it granted summary judgment to the City of Charlotte because there is a jury question on undue influence. We agree.

---

[4] Of course, because we next conclude that Walker's undue-influence theory survives summary judgment, she must be allowed discovery on the remainder of her claims before any trial. *See Ardrey*, 798 F.2d at 682.

9

A.

Under North Carolina law, a contract is voidable if it is obtained through undue influence. *Link v. Link*, 179 S.E.2d 697, 705–07 (N.C. 1971). Undue influence is "the exercise of an improper influence over the mind and will of another to such an extent that [the action] is not that of a free agent, but in reality is the act of the third person who procured the result." *Stephenson v. Warren*, 525 S.E.2d 809, 812 (N.C. Ct. App. 2000) (quoting *Lee v. Ledbetter*, 49 S.E.2d 634, 636 (N.C. 1948)).

Undue influence is related to, but distinguishable from, duress and fraud. *Link*, 179 S.E.2d at 703. Duress requires a wrongful, coercive act. *Id.* at 704–05. But situations falling short of duress may satisfy the standard for undue influence: "Where there is no coercion amounting to duress," another type of "force exerted upon a party" may justify relief under the doctrine of undue influence. *Id.* at 706. Likewise, fraud requires deception, but there may be undue influence even "where there is no misrepresentation or concealment of a fact." *Id.* at 703.

In North Carolina, there are "four general elements of undue influence: (1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence." *Griffin v. Baucom*, 328 S.E.2d 38, 41 (N.C. Ct. App. 1985) (citing *Curl ex rel. Curl v. Key*, 306 S.E.2d 818, 820 (N.C. Ct. App. 1983), *rev'd on other grounds*, 316 S.E.2d 272 (N.C. 1984)). Of these, the first and fourth elements—a person subject to influence and a result indicating influence—are "key." *Curl*, 306 S.E.2d at 820.

10

"Undue influence is an inherently subjective term, and finding its existence thus requires engaging in a heavily fact-specific inquiry." *In re Will of Jones*, 669 S.E.2d 572, 577 (N.C. 2008). And "[n]o test has emerged by which we can measure with mathematical certainty the sufficiency of the evidence to take the issue of undue influence to the jury." *Hardee v. Hardee*, 309 S.E.2d 243, 245 (N.C. 1983); *see In re Andrews' Will*, 261 S.E.2d 198, 200 (N.C. 1980). Nevertheless, the North Carolina courts have articulated lists of relevant "factors" or "badges" of undue influence. *In re Andrews' Will*, 261 S.E.2d at 200.[5] This non-exclusive list includes

> [t]he age, physical and mental condition of the victim, whether the victim had independent advice, whether the transaction was fair, whether there was independent consideration for the transaction, the relationship of the victim and alleged perpetrator, the value of the item transferred compared with the total wealth of the victim, whether the perpetrator actively sought the transfer and whether the victim was in distress or an emergency situation.

*Yurek v. Shaffer*, 678 S.E.2d 738, 746 (N.C. Ct. App. 2009) (quoting *Curl*, 306 S.E.2d at 820). No one factor is determinative, because "undue influence is generally proved by a number of facts, each one of which standing alone may be of little weight, but taken collectively may satisfy a rational mind of its existence." *Jones*, 669 S.E.2d at 578 (cleaned up).

---

[5] The issue of undue influence arises most commonly in will contests, and a set of specific (though non-exclusive) factors has developed in that context. *See, e.g.*, *Jones v. Corn*, 902 S.E.2d 17, 25–26 (N.C. Ct. App. 2024) (reciting the factors articulated in *In re Andrews' Will*, 261 S.E.2d at 200, including that "the will is different from and revokes a prior will"). This case, of course, does not concern a will contest.

11

B.

Walker has forecast evidence, when viewed in the light most favorable to her, that is sufficient to raise a question of fact on the issue of undue influence.

First, Walker has offered evidence that her age, economic condition, and emergency situation made her more susceptible to undue influence. Walker is a widow in her late 70s with a limited income. Her house had been flooded with raw sewage, and she had "no spouse support or money saved up" to fix it. J.A. 216. In her affidavit, Walker testified that at the time she signed the release, she was losing her temporary housing and was "in fear for [her] life" because she "had nowhere else to go" and "it would be very cold in the winter." *Id.* Though initially she signed the release with a "protest statement" included, she removed the statement at the City of Charlotte's request after she "thought about dying." J.A. 217.

The district court concluded that Walker's removal of the protest statement in the second release "indicate[d] her desire to strike a bargain." *Walker*, 2025 WL 2271428, at *2. Though a factfinder may make that determination at trial, here we must view the evidence in the light most favorable to Walker. Applying that more favorable light, a jury could conclude that Walker's compliance with the City of Charlotte's demand for her to remove her protest statement was simply further evidence of its control over Walker's execution of the contract.

Next, the evidence suggests that the City of Charlotte knew about Walker's circumstances. An earlier email informed the City of Charlotte that Walker was "in her late 70s and she won't last long living in her car." J.A. 154. Moreover, the City of Charlotte

12

rejected the first executed release from Walker because "it appear[ed] to intend to put the City of Charlotte on notice that the Release was not signed freely and under no duress." J.A. 147. We do not suggest that the City of Charlotte acted with bad faith or ill motive, but undue influence may void a transaction even "without an affirmative intention of wrong-doing or an evil purpose." *New Amsterdam Cas. Co. v. Waller*, 301 F.2d 839, 843 (4th Cir. 1962) (applying North Carolina law). Rather, a party that "tak[es] advantage of another's weakness" to the extent that it supplants the other party's will has exerted undue influence. *Little v. Bank of Wadesboro*, 121 S.E. 185, 187 (N.C. 1924).

Finally, Walker has forecast evidence that the result of the transaction indicates undue influence, pointing to the disparity between her damages and the settlement amount. The Supreme Court of North Carolina's decision in *Causey v. Seaboard Air Line Railway Co.*, 81 S.E. 917 (N.C. 1914) is instructive here.

There, an employee sustained a head injury while working. *Id.* at 918. The employer provisionally agreed to settle the injury claim for $75, plus his lost two-and-a-half months of wages. *Id.* Eventually, the employee signed a settlement agreement for only the $75. *Id.* In concluding that there was sufficient evidence to support a finding that the employee was unduly influenced, the court noted that the settlement amount did not include "the most important element of damages, [which was] mental and physical suffering, and reduced capacity." *Id.*

Here, a jury could similarly find that the settlement amount did not include important damages amounts. Walker selected Cardinal Restoration from a list of contractors suggested by the City of Charlotte. Cardinal initially quoted Walker $38,200

13

as the cost to repair the structure of her home. Cardinal also noted that the price could increase with needed housing code upgrades and that the parties had already discussed "aggressive corner cutting, doing some of the work [herself], and careful selection of inexpensive materials." J.A. 141. Beyond repairing her home's structure, Walker also faced significant other costs, including those associated with her temporary lodging, with replacing her home's contents, and with her emotional damages. Walker averred that replacing her kitchen cabinets alone would cost over $30,000, and she informed the City of Charlotte that one of her ruined furniture sets initially cost $12,000. But "no matter how much the actual cost was," the City of Charlotte would not pay more than $45,000. J.A. 216. Thus, the jury could find that the financial result of the bargain indicates undue influence.

To be sure, the City of Charlotte also has strong evidence that points away from undue influence. Walker was represented by counsel when she signed the release. *See Yurek*, 678 S.E.2d at 746 (listing "whether the victim had independent advice" as a relevant factor). A jury may well find that this fact is compelling enough to find that Walker suffered from no undue influence in signing away her claims against the City of Charlotte.

But on summary judgment, viewing all evidence in the light most favorable to Walker, we cannot conclude that this single factor is dispositive. *See id.* (listing other factors); *Jones*, 669 S.E.2d at 578 ("[U]ndue influence is generally proved by a number of facts[.]"); *In re Beale's Will*, 163 S.E. 684, 687 (N.C. 1932) (noting that there was a jury question on the issue of undue influence, even though an attorney had drafted the contested will). Indeed, here Walker's counsel has conceded that he was entirely unable to aid Walker

14

in negotiations. *See* J.A. 198 (stating that the increase to $45,000 "wasn't me. . . . I had nothing to do with it"). Because a jury could reasonably find that the presence of counsel did not outweigh the other factual circumstances that created undue influence, we reverse the grant of summary judgment.

C.

We understand the district court's concern that "invalidating contracts like this one would make it difficult for parties to strike bargains that offer sorely needed relief." *Walker*, 2025 WL 2271428, at *3. And we agree that financial difficulty cannot "by itself justify setting aside a settlement on grounds of duress."[6] *Selmer Co. v. Blakeslee-Midwest Co.*, 704 F.2d 924, 928 (7th Cir. 1983). If it were so, those in dire financial straits would be unable to enter into binding settlements. *Cf. Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d 272, 277 (1st Cir. 2002) (inferring duress "from merely the emotional and financial stress associated with loss of a job" would "make it virtually impossible for employers and employees to enter into binding settlements of employment disputes").

But it is also true that "[m]atters stand differently when the complaining party's financial distress is due to the other party's conduct." *Selmer*, 704 F.2d at 928. In such circumstances, a release may present a party with "little more than a 'Hobson's choice.'" *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 524 (3d Cir. 1988).

Of course, a release may implicate more than a simple monetary interest. For example, the Ninth Circuit has held that whether a father had voluntarily signed a release

---

[6] Of course, as discussed in Part IV.A, the standard to set aside a contract due to duress is even higher than that to set aside a contract for undue influence.

was a triable issue of fact when he had to choose between releasing his Federal Tort Claims Act claims against the government or prolonging his separation from his children indefinitely. *Salmeron v. United States*, 724 F.2d 1357, 1361–62 (9th Cir. 1983). The fact that he had been represented by counsel was "not dispositive." *Id.* at 1362. And a potentially life-or-death situation further complicates the question of voluntariness. *See, e.g.*, *Reliford v. United Parcel Serv.*, No. 08-cv-1266, 2008 WL 4865987, at *5 (N.D. Ill. July 8, 2008) (holding that an employer's withholding of medical benefits could constitute duress if the benefits were necessary to preserve the employee's wife's life).

All of that considered, this is a matter that is controlled by the laws of North Carolina. And under North Carolina law, when a negligent actor[7] creates physical peril for a victim and then conditions rescue funds on the release of the victim's claims, there is at least a question of fact on whether the release was obtained through undue influence. *See Link*, 179 S.E.2d at 705–07; *Little*, 121 S.E. at 187; *Causey*, 81 S.E. at 918. That is the factual question that the record before us presents that should be resolved by a jury, not by summary judgment.

---

[7] Walker has not yet had discovery on her claim that it was the City of Charlotte's negligence that placed her in this precarious situation, so we assume it for the purpose of this appeal. Without addressing the discovery limitation, the dissent argues that the record "shows a total lack of evidence that the City was indeed negligent," in part because "there is no suggestion that the sheetrock tape was the property of the City or that the City had played any role in causing the tape to end up in the sewer main." Dis. Op. at 23. But a municipality can be negligent for failing to properly maintain, inspect, and repair the sewer system, even if a blockage originated with a third party. *See, e.g., Bostic Packaging, Inc. v. City of Monroe*, 562 S.E.2d 75, 76–79 (N.C. Ct. App. 2002); *Pulliam v. City of Greensboro*, 407 S.E.2d 567, 570–71 (N.C. Ct. App. 1991). Here, one of Walker's negligence allegations is that the City of Charlotte failed "to use reasonable, ordinary care in the maintenance and inspection of the sewer main." J.A. 70.

V.

For the foregoing reasons, while we affirm the challenged decision about how to manage discovery in this case, we must reverse the district court's decision granting summary judgment and remand for further proceedings.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

After a sewer main in the City of Charlotte, North Carolina, became clogged by a roll of sheetrock tape, sewage backflowed into the home of Stephanie Walker, causing damage to her real and personal property. After the City refused to pay her more than $15,000 — the maximum automatically awardable without fault under its sewer backup policy — she retained an attorney. Her attorney demanded $65,000, but, following negotiations, he obtained an agreement to settle with the City for $45,000. As Walker needed the money to repair her home because of her poor financial condition, she signed the settlement agreement with the approval of her attorney.

After her home was repaired, Walker sued the City to void and set aside the settlement agreement on the ground that she had signed it while under duress. She claimed that the City unduly influenced her into signing the agreement as she lacked financial resources, she needed to repair her home, and the City had greater financial bargaining power. In addition to seeking to set aside the settlement agreement, she asserted claims for negligence, nuisance, inverse condemnation, and the unlawful taking of her property. The City filed a motion for summary judgment, which the district court granted, concluding that Walker had failed to present any evidence that she was, in any way, forced by the City to sign the settlement agreement. The court stated that the settlement was "inherently a compromise" in which she may have "sacrificed full compensation to avoid the uncertainty of litigation." In light of the settlement agreement, the court dismissed Walker's remaining claims and entered judgment for the City.

From that judgment, Walker has appealed.

18

The majority, now, chooses to find sufficient evidence to vacate the district court's judgment, but without any factual support for doing so. One party's personal financial condition is not sufficient to show that the other party in any way overbore the first party's will. To the contrary, the evidence in this case is that Walker exercised her will, with the advice of counsel, and signed the settlement agreement because that was the best financial outcome for her at the time, even though it was a compromise of all that she had wished to obtain. This case presents a routine negotiation for a settlement in which the parties signing were represented by counsel. The fact that the City was able, because of its superior financial condition, to adhere to its final offer is not a ground to void the agreement that Walker voluntarily signed, albeit in protest, with the approval of her attorney. The fact remains that there was *no conduct* on the part of the City to overbear Walker's will. Indeed, after the City adjuster had initially visited her to offer the then maximum $15,000 under the City's sewer backup policy, no representative of the City ever again had any contact with Walker by which to overbear her will. To the contrary, she executed her settlement of her own will, weighing her own financial plight and the amount and timing of the City's offer. And only her own financial condition brought pressure on her. The district court was clearly correct, and I would affirm. Thus, I concur in Parts II and III of the court's opinion and dissent from Part IV.

I

In February 2022, a roll of sheetrock tape clogged a sewer main in the City of Charlotte, causing sewage to backflow into Walker's home. Shortly thereafter, a City

19

claims adjuster offered Walker $15,000 in settlement, which was the maximum amount that the City could automatically offer under its sewer backup policy without any showing of fault. But when Walker contacted a contractor from among those that the City had recommended, she received a quote to repair her home for $38,200. Thereupon, she retained an attorney to negotiate with the City.

While Walker's attorney was negotiating with the City, emphasizing that $15,000 would not cover the repairs to Walker's home, let alone to her personal property, the City updated its sewer backup policy to increase the maximum payment to $45,000 without regard to fault. Accordingly, the City offered Walker the new policy cap of $45,000 for "mitigation and restoration costs" to her home. While Walker's attorney pressed for more, asserting that Walker "would settle the claim for $65,000," the City held fast to its $45,000 offer. Through counsel, Walker then accepted the offer, concluding that it was her best option at the time. Walker signed the settlement agreement and at the bottom wrote, "I'm homeless and I don't have another choice!" When the City refused to accept the settlement agreement as so endorsed, Walker signed a clean copy, releasing all claims against the City for $45,000.

After Walker had made the repairs to her home and had moved back in, she commenced this action against the City. In the first count, she alleged undue influence against the City in order to set aside the settlement agreement, and in the remaining counts, she alleged negligence, nuisance, inverse condemnation, and an unlawful taking of her property.

20

In response to the City's motion for summary judgment, Walker submitted an affidavit to explain why she had signed the settlement agreement while under duress. She stated that she had been "shock[ed]" when the sewage flooded her home and that she could not afford to finance the repairs. She stated that, during the time when the City would not pay her the demanded $65,000, she was "losing the [interim] place where [she] had been living" since the incident; that she "knew that it would be very cold in the winter"; and that she had "nowhere else to go." Plus, she was "concern[ed] about "lawyer fees," "[t]he length of time that it would take to get the case settled," and "the court system." She also stated that she "was in fear for [her] life" and her dog's life, "was under a great deal of stress," and "just wanted to be in [her] home," so she signed the offer "under protest" because she "did not have any other choice." She claimed that she "did not want to sign" the offer but did so that "she would not be homeless any longer."

The district court granted the City's motion, concluding that Walker had not met her burden of showing "circumstances and inferences from which a jury could find that" her acceptance of the offer "was not the product of [her] own free and unconstrained will, but instead was the result of an overpowering influence over [her] by [the City]." (Quoting *Barbee v. Johnson*, 665 S.E.2d 92, 98 (N.C. Ct. App. 2008)). The court noted that Walker had obtained an increased settlement amount, and although she was elderly and poor, she had produced "no evidence to suggest [she] was in any way forced to sign the agreement" by the City. The court further explained that "a settlement is inherently a compromise" and concluded that Walker had "sacrificed full compensation to avoid the uncertainty of

21

litigation and to repair her home as soon as possible." It thus concluded that the settlement was binding and therefore granted summary judgment to the City.

From the district court's judgment dated April 1, 2025, Walker filed this appeal.

II

While the majority neatly parses the elements of an undue-influence claim under North Carolina law, the overarching fact remains that Walker has presented *no evidence of any conduct* by the City that can be considered overbearing conduct so as to constitute undue influence. Under North Carolina law, Walker must show that the City "exercise[d] . . . an improper influence *over the mind and will* of [her] to such an extent that [the settlement] [was] not that of a free agent, but in reality [was] the act of the [City] who procured the result." *Stephenson v. Warren*, 525 S.E.2d 809, 812 (N.C. Ct. App. 2000) (cleaned up). Making an offer of settlement and holding to it plainly does not qualify as undue influence. Otherwise, all settlement agreements reflecting compromise would be the product of undue influence.

In this case, Walker obtained a settlement that fully covered the quoted cost of her repairs and was the maximum amount the City could automatically offer under its sewer backup policy without a showing of fault. While she was indeed dissatisfied with the offer, she consulted with her attorney, balanced her personal financial circumstances with the prospects for litigation, and then knowingly accepted the City's offer. These facts do not indicate undue influence. Undue influence requires that Walker show that her lack of choice was the result of a *third party*, the City, having "substitut[ed] . . . its mind for [hers]

22

. . . causing [her] to [sign a document] which [s]he otherwise would not have [signed]." *In re Kemp's Will*, 67 S.E.2d 672, 674 (N.C. 1951); *id.* at 675 (noting that plaintiff had not shown "an overpowering influence or as tending in any way to coerce her actions or destroy her free will").

Moreover, it appears from the record that the City had no obligation to pay Walker more than the maximum under its program. If Walker thought she could prove otherwise, she could have turned down the offer and filed suit. But on this record, there was little to give Walker hope that she could prove that the City was negligent. Yet, the majority's holding is propped up *by assuming negligence*. As it holds, "[W]hen a *negligent actor* creates physical peril for a victim and then conditions rescue funds on the release of the victim's claims, there is at least a question of fact on whether the release was obtained through undue influence." *Supra* at 17 (footnote omitted) (emphasis added). The record, however, shows a total lack of evidence that the City was indeed negligent. The sewage backup, as alleged by Walker, was caused by a roll of sheetrock tape that had somehow found its way into the sewer, blocking the main and causing the backflow into Walker's home. But there is no suggestion that the sheetrock tape was the property of the City or that the City had played any role in causing the tape to end up in the sewer main.

The facts of Walker's personal situation were indeed unfortunate, but the fact that she was, in her view, not compensated by the City with more money does not give rise to a triable issue of undue influence by the City. The City presented Walker with its final offer of settlement, and she made the rational decision to accept it as a guaranteed, timely payment in lieu of taking her chances with litigation. *See, e.g.*, *Yurek v. Shaffer*, 678 S.E.2d

23

738, 747 (N.C. Ct. App. 2009) (concluding that there was "little evidence to support a claim of undue influence" where, in signing a consent judgment giving custody of her child to a relative, the record showed that the plaintiff had "made a rational determination" of what was in her and the child's best interests). Settlements involve compromise and negotiation, and parties often feel that they have either overpaid or been undercompensated. But those are the risks that parties accept when they choose to settle matters outside the judicial system. The controlling point is, however, that dissatisfaction with one's own bargaining power is not undue influence by another who has a greater bargaining power. Yet the majority seems to assume so.

I respectfully dissent from Part IV.